## Case No. 14,439.

### UNITED STATES v. AMERICAN GOLD COIN.

[Woolw. 217.] [1]

Circuit Court. D. Missouri. Oct. Term, 1868.

FORFEITURE — GOLD COIN — INTRODUCTION INTO CONFEDERATE STATES—INTENTION—ARTICLE OF MERCHANDISE.

1. The object of the 22d rule of the trade regulations of September 11, 1863 [3 House Ex. Doc.

[1] [Reported by James M. Woolworth, Esq., and here reprinted by permission.]

(1862) p. 416]. was to prevent gold coin reaching the rebels in any manner, as well by gift, trade, or exchange, as even by being exposed to being taken by violence by them.

2. In order to attain this object, the terms of the rule absolutely prohibit the introduction of gold coin into the region declared to be in insurrection.

3. The intention with which a party transports gold coin into such territory, alleged to be merely to convey it to his home therein, and retain it as an investment, does not relieve the transaction from a charge of violating the rule.

4. Gold coin would at any time be held to be included within the terms "goods and chattels, wares and merchandise."

5. At the time the 22d rule was made, the fact was, that gold coin was bought and sold as personal property, in open market, at fluctuating relations to the actual current money of the country.

6. It was competent for the president and secretary of the treasury to act on this fact in framing those rules and regulations.

7. And even without such action on their part, the court should take judicial notice of the fact, well known to every citizen, that gold coin has ceased to be used in the business of the country as money, and has become an article of merchandise and traffic.

[Appeal from the district court of the United States for the district of Missouri.]

On the 13th day of July, 1861, congress passed an act, entitled, "An act further to provide for the collection of duties on imports, and for other purposes," the 5th section of which is as follows: "Sec. 5. And be it further enacted, that whenever the president, in pursuance of the provisions of the 2d section of the act entitled 'An act to provide for calling forth the militia to execute the laws of the Union, suppress insurrections, and repel invasions, and to repeal the act now in force for that purpose,' approved February 28, 1795 [1 Stat. 424], shall have called forth the militia to suppress combinations against the laws of the United States, and to cause the laws to be duly executed, and the insurgents shall have failed to disperse by the time directed by the president, and when said insurgents claim to act under the authority of any state or states, and such claim is not disclaimed or repudiated by the persons exercising the functions of government in such state or states, or in the part or parts thereof in which said combination exists, nor such insurrection suppressed by said state or states, then and in such case it may and shall be lawful for the president, by proclamation, to declare that the inhabitants of such state, or any section or part thereof where such insurrection exists, are in a state of insurrection against the United States; and thereupon all commercial intercourse by and between the same and the citizens thereof, and the citizens of the rest of the United States, shall cease and be unlawful so long as such condition of hostility shall continue; and all goods and chattels, wares and merchandise, coming from said state or section into the other parts of the United States, and all proceeding to such state or section, by land or water, shall, together with the vessel or vehicle conveying the same, or conveying persons to or from such state or section, be forfeited to the United States: provided, however, that the president may, in his discretion, license and permit commercial intercourse with any such part of said state or section, the inhabitants of which are so declared in a state of insurrection, in such articles, and for such time, and by such persons, as he, in his discretion, may think most conducive to the public interest; and such intercourse, so far as by him licensed, shall be conducted and carried on only in pursuance of rules and regulations prescribed by the secretary of the treasury. And the secretary of the treasury may appoint such officers, at places where officers of the customs are not now authorized by law, as may be needed to carry into effect such licenses, rules, and regulations; and officers of the customs and other officers shall receive for services under this section, and under said rules and regulations, such fees and compensation as are now allowed for similar service under other provisions of law." 12 Stat. 257. And on the 11th day of September, 1863, under the authority so conferred, the secretary of the treasury prescribed, and the president approved "trade regulations," the 22d of which was as follows: "22. All transportation of coin or bullion to any state or section heretofore declared to be in insurrection, is absolutely prohibited, except for military purposes, and under military orders, or under the special license of the president. And no payment of gold or silver, or foreign bills of exchange, shall be made for cotton or other merchandise within any such state or section. All cotton or other merchandise purchased in any such state or section, to be paid for therein, directly or indirectly, in gold or silver, or foreign bills of exchange, shall be forfeited to the United States." For the forfeiture of certain gold coin taken while the claimant here was transporting the same to Tennessee, this libel was filed.

The answer of Robeson, the claimant, contained the following statement: He resided near Memphis, and had been to St. Louis. Here he had purchased the gold, and was carrying it on his person to his home when it was seized. He had purchased it as an investment, and was using it in the payment of his travelling expenses as far as was necessary. He had no purpose of using it in trade or commerce, but only to defray his personal expenses on his journey home, and in his living at home. Nor did he design to convey it to the Confederates. The question was, whether these facts constituted a defence.

Mr. Noble, U. S. Dist. Atty.
Glover & Shepley, for claimant.

MILLER, Circuit Justice. The claimant insists, in the first place, that the case is not within the terms of the 22d rule prescribed by the secretary of the treasury. He admits that he was carrying the gold from St. Louis to Memphis without a license; but he attempts to qualify the character of his act by claiming that it was his own money, which he was carrying to his own home, and that he was doing so as one might carry about his person the means of defraying the expenses of his journey. By these statements he excludes the idea of his transporting the coin for any commercial purpose; and thus he claims that he committed no infraction of the rule.

The object of the rule will appear from a slight consideration of the circumstances under which it was made. The people of a large section of the country had revolted against the government, and succeeded in excluding therefrom its authority, and in establishing a government of their own, and in putting large armies in the field. It became necessary for the national government to restrict and cripple the means of the new organization for its maintenance, on every hand, and by every measure possible, and at the same time consistent with the laws of war. The rebels were compelled to provide themselves with munitions of war and other supplies necessary for its prosecution from abroad. Gold coin was the only money with which these purchases could be made. Anything which would prevent their getting such money was an efficient measure for disabling them from continuing the struggle. And this was the object of the 22d rule.

It was not a matter of consequence how the rebels should obtain the gold with which to make their necessary purchases. It was all the same to them, so far as that was concerned, whether they obtained it by gift or trade, or exchange of commodities, or by capture. If it were in an exposed place, where by violence they could make booty of it, their purpose was answered just as perfectly as if they sold cotton for it. What they wanted, was to get it; what the national government wanted, was to effectually prevent their getting it.

Accordingly the terms of the rule are general and imperative. "All transportation of coin or bullion to any state or section heretofore declared to be in insurrection, is absolutely prohibited, except for military purposes, and under military orders, or under the special license of the president." No exception is made here. We cannot make any. The intention of the claimant in transporting the coin into the insurrectionary district, as he has declared the same in his answer, does not relieve the transaction of the charge of violating the rule.

The claimant, in the second place, insists, that if that be the construction of the rule, the act of congress does not authorize the secretary to prescribe it.

The argument here is substantially the same as it was upon the just construction of the rule. On the one side, it is said, that the statute prohibits commercial intercourse, and not personal intercourse, in which the parties may carry on their persons necessary money for their private expenses. On the other side, it is urged, that all intercourse not of a warlike character is prohibited, as well that of private persons and private property for private purposes, as that of trade and commerce.

What is said above as to the object of the rule, applies equally to the statute.

But it is further urged, that the gold coin was not "goods and chattels, wares and merchandise," which by the act are forfeited.

It does not admit of doubt that gold coin would, at any time, be held technically to be included within the terms "goods and chattels, wares and merchandise;" and especially so at the time the rule was made. Whatever was its legal character as money, it had, in point of fact, ceased to be used as a medium of exchange, and had become an article of merchandise, bought and sold in open market as such, at varying and fluctuating relations to the actual current money of the country. It was proper for the president and secretary to ascertain and act upon this fact. This court will adopt their determination, and sustain the rule which, in their proper discretion, they have prescribed.

And even if we were not to be guided by their action, we should take judicial notice of this notorious fact. The court is not bound to shut its eyes to a fact known to every man in the United States, that one hundred nominal gold dollars are worth, in open market, two hundred dollars of the recognized currency of the country; that gold coin is no longer used in its character as money, and is a standing article of trade, and its price quoted in reports of the market as regularly and exactly as wheat or stocks.

In Bronson v. Wiman, 10 Barb. 406, it was held that the courts will take judicial notice of the ordinary modes of transacting commercial business within the state. In Oppenhiem v. Wolf, 3 Sandf. Ch. 571, it was held that facts which are a part of the experience and common knowledge of the day—e. g., the usual time for steam passage across the Atlantic—are legitimate grounds for the judgment of the court. In Smith v. New York Cent. R. Co., 43 Barb. 225, it was said that the rule that the courts may take judicial notice of whatever ought to be generally known within the limits of their jurisdiction, includes notice of the great lines of public travel and transportation of property, and their connection with each other, and the general course of trade and transportation through the country.

In Bank of Augusta v. Earle, 13 Pet. [38 U. S.] 519, the supreme court of the United States said: "It is a matter of history, which

this court are bound to notice, that corporations created in this country have been in the open practice for many years past of making contracts in England of various kinds, and to very large amounts."

These are all cases relating to private matters. The question here, arising upon the currency of the country, the medium not only of private exchanges. but of the measures of the government, touches the public concerns. Our right to notice such a fact of common knowledge cannot be doubted.

Whatever it once was, we know that gold coin now is an article of merchandise, and, as such, it is, when proceeding to an insurrectionary state, liable, under this act of congress, to be forfeited.

In insisting that his intention shall be regarded as qualifying the nature of his act of conveying this gold coin to Tennessee, the claimant falls into one serious error. He should remember that congress enacted this statute, and the executive prescribed this rule, at a time of great public distress, for the safety of the state. Its necessities rise above individual interests. To relieve them, it may, it often does. it must, enforce upon the citizens severe measures. At such times, before such measures, his convenience must yield. His intentions cannot qualify the rule of the state, nor protect him from the consequences, however severe, of the most innocent breach of its prohibition. With his eye fixed on his personal act, and blind to the public good, this may seem harsh; but the state is above the citizen, and its necessities are above his interests. The judgment of the district court must be affirmed. Judgment affirmed.